I will turn to the first case on the calendar, which is United States v. Patrick Muraca. Counsel. Good morning, Your Honors. May it please the Court, my name is Brendan White. I represent Appellant Patrick Muraca in this case. Here the jury asked a straightforward question during deliberations with respect to a key issue at the case. What is the definition of capitalization, a term that had come up at trial, and can capitalization include intellectual property? There was a lengthy colloquy lasting approximately 50 or so transcript pages and actually going overnight with letter briefing from both sides, cases cited, and ultimately, after extended discussion, the Court declined to answer the jury's question substantively and essentially just told them it was up to them and that it was not going to provide definitions of those terms. The Court relied principally on United States v. Russo, but United States v. Russo was not controlling here for two important reasons. First, unlike here, and critically, Russo did not involve a note from the jury. It involved a requested instruction from Appellant Counsel, which was not ultimately given, and it related specifically to a term that can best be described as jargon, rather than as a legal or a significant operative term, as was the case here. Capitalization, as I noted in my reply brief, is actually defined in Black's Law Dictionary, which is about... Counsel, this is Judge Brewer. Yes, Your Honor. What the Court said was that the term capitalization was not defined by an established set of legal criteria. Isn't that correct? And wouldn't she, therefore, have to make up a definition of a non-scientific or legal term? Well, the term is defined in Black's Law Dictionary, among other things. It's contained in the United States Tax Code. It's a term that's used routinely in business law, and frankly, Your Honor, it's a situation where it often occurs that parties and courts need to put their heads together a little bit, at least, to come up with an agreed-upon meaning. The term does have several accepted meanings in Black's Law Dictionary. Mr. White, excuse me. This is Judge Lynch. Isn't that just the point, that there are several possible definitions, depending on context? May I ask you, would it have been open to the government and to the defense to bring on an expert witness who would say something like, in my experience of many years in the hedge fund business or the venture capital business, I've participated in lots of these things, and when somebody tells me that the company has a capitalization of X, this is what most people in that industry would take it to mean? Would that have been, assuming appropriate qualifications for the expert, appropriate testimony for either side to offer? Your Honor, are you asking during the course of the trial or ... Yes, of course. During the trial, yes. During the trial, of course. Yes, of course. Certainly, that could have happened. Well, if that happened, and if both sides had experts with different explanations, would it have been appropriate under that kind of circumstance for the judge to say, well, ladies and gentlemen of the jury, you heard these experts, but frankly, here's what I think the appropriate legal definition is, and cited one of the definitions from Black's Law Dictionary, and said that's what you should take capitalization to mean. Would that have been appropriate for the judge if there were expert testimony on both sides? I believe under those circumstances, it probably would have been appropriate for the judge to refer to the evidence at trial. However, that is not what happened here. Well, but then why is it different if both sides, if neither side takes advantage of that opportunity, but as I understand what happened here, the government asked the person, the investor, or at least an investor who was testifying on the stand, to whom a representation was made about capitalization, and asked what he understood it to mean, and that was subject to cross-examination. By subject to, I mean it could have been cross-examined, but it wasn't, and no one said, boo, either in cross-examination or summation, to challenge what the witness had said it meant. So why under those circumstances does the judge get to say, well, never mind what he said. This is what it means. Well, Your Honor, I think ultimately, you have to go to Ballenbach, which was expanded upon in Antiton, which I recognize, of course, is not a Second Circuit case, but I believe it's closer to being on point here than Rousseau certainly was, and the key question under any circumstances is that the jury needs to be able to understand what the key principles here. Capitalization really is not a simple, factual question. It has operative significance. I would say, I would go so far as to say, yes, it is a legal term, frankly, Your Honor. It's described in the law dictionary. It's defined in the United States tax code. The court, under the circumstances, you describe- But this wasn't a tax case, though. This wasn't a tax case. So why would it be appropriate, for example, to just lift a definition from the tax code and say this is what it means in the investment community, which is the relevant question, isn't it? Ultimately, you're talking about a jury that's then going to be forced to fly blindly without understanding what a critical term in the case is, a term that, yes, is obviously not a tax case, but undoubtedly a business-oriented case. Bookkeeping was of central importance here. Numerous business concepts came up, and the entire theory of the prosecution was that this was not operated properly as a business. And ultimately, capitalization, what that means, what it means to investors, is going to be critical, and the jury has to be able to know that. That's what Ballenbach said, and that's what other courts have said. Amazingly enough, this jury hasn't said that yet. I apologize, Your Honor. Excuse me. This is Judge Walker. Why isn't it just purely a question of fact, what capitalization is, in the context of your case? And if the judge weighed in with one definition, then it would be basically taking sides in the factual dispute that exists. I mean, it could be argued in the summations, but having been no extra evidence having been Why should the judge supply factual evidence in the nature of expert testimony on a fact question? Well, I suppose the only way of answering that is if fact is the correct word. And I don't agree with that, Your Honor, but ultimately, the jury was being asked to find that my client lied to his investors because, among other things, he falsely stated what the capitalization of his businesses was. And how can the jury determine what is true and what is a lie without understanding that central operative term? Is that the judge's obligation? That's the question. I submit that it is. On a question of fact, I mean, I know that's your position. The other thing about Bollenbeck, if I recall correctly, is that there was in that case, the judge actually provided instructions that were erroneous and misleading, as well as and the judge, the jury start clarification on legal issues. And the issue was the knowledge element of theft. That's a world apart from what this is. It's, of course, distinguishable. If this case were entirely on all fours with Bollenbeck, I don't think we would have been here in the first place. But I do submit that it's close enough to Bollenbeck and close enough, quite close to Anderton of this circuit case, and really not very close to Russo, the case in which Anderton, the trial judge, erroneously instructed the jury regarding the entrapment defense and agency principles relating to that. There was no misleading of the jury in this case. There, there were instructions that were misleading to the jury. At least that was, I believe, what our holding was. Ultimately, though, it's not the key question for Anderton, at least, was that the jury, the judge has an obligation to give requested instruction, requested definition to the jury. There, I mean, the judge compounded the error by giving an incorrect definition. Here, at least Judge Abrams did not do that. But nevertheless, she failed at the core duty of answering the jury's question and letting it have the legal and operative information that it needed to reach a correct verdict. Counsel, you've re-obtained two minutes for rebuttal. We'll hear now from the government. Thank you, Your Honor. Thank you, Your Honor, and good morning, and may it please the court. This is David Abramowitz for the United States. I'm an assistant U.S. attorney for the Southern District of New York, and I represent the United States in this appeal, as I did in the district court. The district court's decision not to give jurors disputed factual information that came from outside the record was obviously correct. As the panel was hitting on in its questions to Mr. White, this was a factual term in the context of this case, and both sides had a full opportunity to present any evidence that they wish about the meaning of that term. The government presented evidence. Counsel, this is Judge Fuller. Did the two sides in this case have a different definition of capitalization? Yes, Your Honor. I mean, we had a different definition of capitalization as the defendant used it in his communications with the investor who testified. We still don't know. Just to be clear, the definition that the defense requested was not from Black's Law Dictionary. We still don't know the source of the definition that the defendant requested. It was a definition that talked about intellectual property and that said that the value of intellectual property and other assets depends on what the company chooses to assign to it. Sitting here now, there's nothing in the record that says what the source was of the defendant's definition. And so, yes, the government opposed giving that definition to the jurors. But the defendant had a chance to cross-examine the government's witness, the investor to whom Murafa used the term capitalization. And, of course, as Judge Lynch said, both sides had an opportunity to call an expert to testify more broadly about the general meaning of the term capitalization in the industry. Now, of course, the mere fact that there are four definitions in Black's Law Dictionary shows that there are multiple meanings. There's no one easy definition of capitalization, and it would not have been proper for the court to weigh in on that issue, which was absolutely a factual issue. There was no use of the word capitalization in the court's regular jury instruction because it simply was not a legal term. It was a factual term. And, Mr. Abramowitz, this is Judge Lynch. It's also the case, is it not, that there was no request at the charge conference or prior to trial or before the charge was given that the judge give an instruction on this subject? That's exactly right, Your Honor. And when you were answering the question about did the parties have different definitions, you answered that in reference to the colloquy on the jury note. But prior to that time, had the defense offered in summation or cross-examination or anywhere else any argument, let alone evidence, contesting what the government's witness had said? No, I'm stumbling a little bit on whether there were any questions on cross-examination, but if there were, they were very brief and fleeting. But no, to put this in context, I know it's the topic we're talking about on appeal, but this was a drop in the bucket of the government's evidence at trial. This was not a major issue. The meaning of capitalization was far from some major issue that the parties were going back and forth on during the case. And so, no, the government elicited the investor's understanding of what the defendant meant when he used the term. But that was, and the government mentioned it in summation, in a brief portion of a very long summation. But other than that, no, this was not a topic the parties were focusing on. And I do want to just put the investor's testimony in a little context. He was not merely testifying to his understanding of the term capitalization in a vacuum. He was testifying about his understanding of the term capitalization as used by the defendant in light of the other statements the defendant was making. So there was this brochure for Metabo that used the term capitalization. That's a special appendix of 353. And if you look at the witness's testimony, starting at, I think, around page six of the special appendix, you'll see that there are other representations that the defendant was making about how other people had already invested in his company and the company already had funding, already had money from these other seed investors. All of that was a lie. And all of that informs the witness's correct understanding that when Morocco said there was capitalization to date of $1.5 million, he meant that there had been money raised in the past. And that was a fact that was key to this witness and his decision to invest. But in the context of the case, again, this was a small issue and it was a factual issue. And there was simply no, there could not have been any error in the court's decision not to go outside the record or to give an unsourced definition of the term offered by the defense in response to the note. I'd be happy to address any other questions from the panel, but otherwise I'd just assume rest on my submission. Mr. Abramowitz, I just have one question about the forfeiture issue. What was the logic of the forfeiture? I understand, of course, that forfeiture relates to the gains from the crime, which is different than the losses. But this is a somewhat unusual case in that, as I read the record, it was in the range of one hundred thousand dollars of loss and restitution that was made. Now, lots of money was extracted, apparently under false pretenses, or at least the jury could have so found adding up to over a million dollars. But it seems a little strange to me to require the defendant to forfeit that much money when at least some substantial part of that money actually did go into the business. And the substantial number of investors decided to leave their investment in, which apparently suggests that they thought they got value of some kind for what they invested. So is it the mere fact that let's assume for the sake of this question, Mr. Morocco lied to people. They gave him money, some of which he misappropriated, others of which he put into the business. And but therefore everything that he got at any point, even if it remained with the business or in some way was returned to the investors later, has to be forfeited. Yes, Your Honor, to the extent he obtained that money by fraud, and in this case he obtained all of the investment by fraud, that money is forfeitable even if the it's sort of an absurd example. But if the defendant promises investors, invest in my energy company is very promising and I'll give you whatever stake in the company and the investor spends one hundred dollars and the defendant instead spends that hundred dollars in lottery tickets and the investor wins the lottery, the investor may be better off, but the defendant still obtained the one hundred dollars. Sure, I get I get that. But what if what excuse me, what if the perpetrator in your example took the hundred dollars and put 50 in his pocket or his girlfriend's restaurant business and the other 50 into the very business that the investor wanted to invest in? Still, it's fifty dollars. It's not fifty dollars, but one hundred dollars that is forfeit to the government. Well, in this case, yes, because in this case, although Barack has spent some of the money on seemingly legitimate expenses, that's not uncommon in these frauds. It's normal to spend some of the money to try to keep up appearances and make it seem as though there's a legitimate business going on so that you can attract more investors down the road. It's all part of the same scheme. And so even though some of the money was spent on business expenses, the business had no chance of success when Morocco at the same time was draining the vast majority of the funds for his own personal benefit and for his fiance's restaurant. And so because all of that money was obtained fraudulently, all of that money is inflexible. So you would equate this to some sort of like expenditures during a Ponzi scheme of lulling, lulling investors, paying money back out to investors is still it's illegal. The whole thing was fraudulent. Yes, and with the with the caveat that I do want to note that in this case, the investors did not ultimately get anything back. I understand that they submitted a letter saying some of them that they wanted to keep their investments in. Keep in mind that that was also noted in the pretension report during a time when Morocco was still lying to them about the assets of the company and about interest from outsiders in the company. So these are not victims who actually did recognize value in the end. But yes, that that principle is correct that the Ponzi scheme. Thank you. This is a plan to review. Yeah. I'm sorry, Judge Walker, did you have a question? Oh, yes. We're reviewing this question for Plain Arrow, I guess. Yes. Yes, this is review for Plain Arrow, and I just want to note that to the extent there's a complaint that Judge Abrams did not elaborate enough on her forfeiture findings, although we think she made ample findings on forfeiture, that is likely the result of the fact that there was no objection. Thank you, counsel. We'll hear from plaintiff's defendant's counsel, Mr. White, for two minutes of rebuttal. Thank you, Your Honor. I do believe that both the the question of forfeiture and the question of the jury note tie in together that ultimately this relates to two. Although it wasn't charged this way, it probably would have been cleaner and arguably better to do so to charge the two companies separately. There were two separate businesses dealing with different aspects of the biotech sphere. Well, Mr. White, to me on that question, this is relevant to several issues in the case. Was there ever a request for a special verdict separating the two companies? I do not believe there was, Your Honor. But ultimately, it relates to NDMX, which was a an ongoing business for which they had intellectual property that had value. That business essentially still exists. The investors still retain shares in it and still remain supportive of that business. And they believe that the intellectual property that NDMX owns is quite valuable. Metabo also has intellectual property that potentially has value, but admittedly was a more speculative investment. In terms of the forfeiture question, it's important because the investment in NDMX is still a valuable investment and should not be included as part of the same forfeiture as relates to Metabo. Well, again, Judge Lynch, again, was any of that suggested to the district court at any time, not just in the form of a special verdict? Was it argued to the judge that with respect to forfeiture or a loss amount or anything else, everything related to NDMX should have been excluded? I think the only fair way of saying it was alluded to, Your Honor, I think it could have been made more clear. But this is Judge Brewer, weren't the funds commingled? Ultimately, I mean, nobody has ever denied that Mr. Maraca did not do a very good job of keeping his books. It's undeniable that the defense, of course, was that he was a scientist, not a businessman, and that this that's what got him in trouble. It was never a criminal intent. He owned and put a ton of work. All the witnesses acknowledge he worked extremely hard on these businesses. And put a lot of sweat equity and put his own money and money of other investors into obtaining the intellectual property. And ultimately, that is the question that they were asking the jury to decide, was he really acting fraudulently with respect to these two businesses? And they did not get their answer, Your Honor. Thank you, counsel. We'll reserve decision. Thank you, Your Honors. Have a good day. Thank you.